This is a will contest. In circuit court, the sole issue was whether the purported signature of testatrix, Mary J. Wood, was genuine or forged. In this court, the principal question is whether the verdict, holding the signature genuine, was against the great weight of the evidence.
Mrs. Wood died at Los Angeles, California, September 30, 1928, aged 64 years. The disputed instrument was dated August 23, 1928, devised $3,000 to one Dr. McGibben to purchase an automobile, *Page 562 
divided the residue of the estate, one-third to Mrs. Wood's sister, Mrs. Huston, and two-thirds to her brother, proponent Albert B. Lincoln, her only close relatives, and named Lincoln as executor. The will is informal, couched in simple language, revokes former wills and codicils, but is without the usual attestation clause.
Contestants were residuary legatees under several former wills executed by Mrs. Wood. They were protégés of Mr. Wood. In 1910, Mr. Wood, who had advanced from working carpenter to executive positions in the service of others, established his own construction business and took contestants into his employ. In 1914 he incorporated the concern and admitted them to stock participation on favorable terms. In 1921 he permitted them to acquire stock control by reducing to 42 per cent. his own ownership, through surrender of shares, in payment of a debt to the corporation and their redistribution as a stock dividend. Mr. Wood was accidentally killed in November, 1922. His will was executed in 1915. Mrs. Wood was the sole legatee. They had no children. Contestant Austin witnessed the will and was named executor. The estate consisted principally of stock in the W. E. Wood Company and a large ranch near Roscommon, Michigan. Mr. Wood was indebted to the company. About a month after his death, contestants, as board of directors of the company, declared and distributed a stock dividend, then canceled some shares of Mr. Wood's stock in payment of his debt, distributed those shares as a stock dividend, and thereby reduced Mrs. Wood's proportionate ownership to 34 per cent. Richardson testified that Austin had talked over the transaction with Mrs. Wood. No report of it was ever made to probate court nor did the testimony show that Mrs. Wood understood or *Page 563 
agreed to it. A jury would be justified in looking at it askance.
Austin handled the estate as executor until February, 1927. Mrs. Wood desired his further aid, and shortly thereafter, at his suggestion, she gave him a very broad power of attorney. She relied implicitly on him for business guidance to the time of her death. The record disclosed no act of his in the handling of her affairs to which exception could be taken, aside from the stock manipulation in 1922. Under direction of contestants, the W. E. Wood Company prospered increasingly after Mr. Wood's death, and paid Mrs. Wood handsome dividends in cash and stock.
As indicated by her correspondence and conduct toward them, Mrs. Wood was friendly with contestants and their families as long as she lived. She made them many valuable gifts. As late as the summer of 1928 she visited the Richardson summer home and the Austins visited her at the ranch. A few days after her husband's estate was closed, in 1927, she made contestants a present of shares of stock in a corporation which Mr. Wood had formed and which held a long-term lease on property in Detroit. While the lease did not carry its own charges, the potential value was great, and Mrs. Wood completed the gift after Austin had written her that contestants had offered $100,000 to another holder for a like amount of stock and the offer had been refused.
Mrs. Huston was older than Mrs. Wood. Their relations were not close because Mrs. Wood did not like Mr. Huston. She had at least a sisterly feeling toward her, tinged with pity. The Hustons were not affluent as Mrs. Huston worked as a cook in a restaurant at Rochester, Michigan, for some three years before Mrs. Wood's death. Mrs. Wood made some small gifts to Mrs. Huston, but from the tone of her *Page 564 
letters it may be gathered that she restricted them from fear that Huston might be benefited by them.
Lincoln was five years younger than Mrs. Wood. From 1913 to 1919, Lincoln was register of deeds of Jackson county, Michigan. He then had an operation, from which he never wholly recovered. He sold real estate and insurance at times, and, in 1925, entered the grocery business. His financial condition was not shown, but it may be inferred from the fact that when, in 1926, after long and much persuasion, Mrs. Wood induced him to sell the store, she paid his debts of about $4,000, and thereafter made him an allowance of $200 per month. He did not seek gifts from her. He rather avoided them. Always very fond of Lincoln, Mrs. Wood's relations with him grew more close after 1926, and she came to depend upon him for personal attention. In the fall of 1926 and also 1927 she took him and his wife to California with her for the winter, paid their expenses, and lived with or close to them.
After her husband's death, Mrs. Wood lived in Detroit for a time and then moved to the ranch. During her later years she became very large, at one time weighing 295 pounds, and was afflicted with a large number of grievous ailments. On their first trip to California together, Lincoln introduced her to Dr. McGibben, who treated her both physically and mentally, greatly relieved her, and in whom she had abundant confidence. On her return to Michigan, in May, 1928, she brought a companion recommended by Dr. McGibben, Miss Hall, who looked after her diet, gave her personal attention, remained until about June 15th, and to whom Mrs. Wood became so attached that she offered to pay the expense of a training in X-Ray work for her and gave her $500 toward that end. *Page 565 
In August, 1928, Mrs. Wood, then at the ranch, became alarmingly ill. At one time she obtained a prescription from Dr. McGibben by long-distance telephone. Her condition became so serious that she decided to go at once to California to receive treatment from him instead of waiting until late in the fall as she had done before. She had authorized Austin to sell the ranch, and she decided to move to California. She telegraphed her brother, who lived in Jackson, to come to Roscommon and go to Chicago with her. He came to her, and it was arranged he should accompany her to California, return to complete some business upon which he was engaged, and then go back to take care of her. He drove to Detroit. She went by train, arrived at the Detroit Leland hotel in the afternoon of August 22d, and left for Los Angeles in the afternoon of August 24th.
The will at bar is claimed to have been executed about 3 o'clock in the afternoon of August 23d at the hotel. It was witnessed by Jessie Paul, a niece of Mrs. Albert Lincoln, and Emily Bennett Brown, Mrs. Paul's mother. They testified that on the morning of August 23d, Mrs. Wood called Mrs. Paul by telephone and asked her to bring her mother to the hotel; they went to Mrs. Wood's room about 3 p. m.; after some general conversation she asked Mrs. Paul to write for her; Mrs. Wood took a loose sheet of tablet paper from a black bag and handed it to Mrs. Paul with a magazine; Mrs. Wood was sitting on the bed, Mrs. Paul on the baggage rack, and Mrs. Brown on a chair; there was a flat-top desk in the room but they did not use it; Mrs. Wood consulted a paper, apparently reading something already drafted, and Mrs. Paul, using her own fountain pen, wrote at dictation; after it was completed it was signed by Mrs. Wood and witnessed by the others, each signing *Page 566 
while the paper rested on a magazine in her lap; Mrs. Wood took possession of the instrument.
Mrs. Wood left for California the next day. Lincoln boarded the train at Jackson. He claims she told him she had made a will in the presence of Mrs. Paul and Mrs. Brown, detailed its contents, and warned him that she did not know what property she had, and that he was not to disclose the will until he found out. He stated he was greatly surprised, because she had told him she was going to make a will when she arrived in California, and he argued with her about three women making a will without the aid of a lawyer. After she was settled in Los Angeles, Lincoln returned to Jackson to finish his business. He said that, as he was about to leave and when he went into his sister's room to bid her good-bye, she took the will and a bag containing rings from the bosom of her dress and gave them to him with the injunction to take care of them and to bring them back to her when he returned. Mrs. Wood died while Lincoln was en route back to California.
On the day she died, Mrs. Wood signed two checks, one for $600 to Margaret Hall to finish her training, and one in blank to cover the balance of her account, which she instructed Miss Hall to have converted into a check to Lincoln. The bank refused to cash the checks, as Mrs. Wood was dead when they were presented.
When Lincoln arrived at California, he took charge of the arrangements to bring Mrs. Wood's body back to Detroit. On account of her size, a special casket was necessary and the return was delayed. In the meantime Lincoln asked and received money and instructions from Austin and reported the expense to him. He also consulted the bank about payment of the deathbed check to him, retained *Page 567 
an attorney and affidavits were taken to show a gift intervivos of the bank balance from Mrs. Wood to Lincoln. The showing was not accepted by the bank. Lincoln did not disclose to the bank nor to his own attorney that he was in possession of a will leaving the estate to himself and his sister. Mrs. Wood's clothing and other property in the apartment were packed up, and Lincoln took them with him when he brought the body to Michigan.
The funeral was held at Austin's home, October 10th. Austin asked Lincoln and Mrs. Huston to come to his office the next day, which they did. Lincoln and Mrs. Huston testified that on the way to Austin's office Lincoln told Mrs. Huston he had a late will, but to say nothing about it and to let him do the talking. Lincoln gave Austin the key to Mrs. Wood's private safety deposit box. Mr. Peter Monaghan, an attorney, was called in consultation and advised that appointment of a special administrator would be necessary to gain access to the box. Mrs. Huston nominated Lincoln, but the latter refused, and suggested Mr. Austin. Mr. Monaghan drafted and Lincoln executed, under oath, a petition for Austin's appointment as special administrator, the petition containing this language:
"I further represent that said deceased departed this life on the 30th day of September, A.D. 1928, leaving a last will and testament, as I am informed and verily believe, which will according to the information of your petitioner is now in the safety deposit box of the decedent in the People's State Bank in Detroit, Michigan."
Austin and Lincoln visited the ranch together, looked it over, searched the desk in which Mrs. Wood kept some of her belongings, and Lincoln asked Austin if he could have certain family pictures. *Page 568 
On October 15th, after the appointment of special administrator, the deposit box was opened and a will of November, 1926, with a codicil of 1927, was found and read in the presence of Lincoln and Mrs. Huston.
During these transactions Lincoln made no mention of a later will. He claims he failed to disclose the will because Mrs. Wood had told him not to do so until he had found out the extent of her property, that he was suspicious of Austin, thought the latter would be more likely to disclose the whole estate if he thought contestants were the principal beneficiaries, and decided to conceal the will until the inventory was made, as he knew he had 30 days to begin probate. Later he consulted an attorney and petitioned for the probate of the will at bar. It was filed October 27th, before Austin had filed an inventory.
The record contains 1,100 pages, covering the testimony of 51 witnesses, about equally divided between proponent and contestants, and 268 exhibits, including 97 letters written by Mrs. Wood. The briefs were exhaustive and searching on fact and inference. We are not called upon to discuss all the arguments in detail. It is not in our province to determine where the preponderance of testimony lies, but, with proper appreciation of the function of the jury to pass upon the facts, and its advantage of a view of the witnesses, a distinct advantage in this case, to find whether the evidence against the verdict, with admissible inferences, was so over-whelming as to demonstrate that the jury made its determination from prejudice, sympathy, desire to make a will for the testatrix, inability to appreciate the probative force of testimony, or other reason aside from a judicial consideration of the witnesses and the evidence. *Page 569 
There was a mass of testimony as to Mrs. Wood's declarations of testamentary intention, extending over many years. The best evidence of her intention prior to 1928 is found in four wills, executed by her on April 24, 1924, January 5, 1925, August 30, 1926, and November 24, 1926, respectively, and a codicil made November 3, 1927. In all of these wills she gave to each of contestants' wives a ring and to. contestants the residue of the estate, except personal effects and certain allowances. In the first will she provided an allowance of $200 per month for life to Mrs. Huston, revoked it in the second and gave a friend, Mrs. Winn, $200 per month for five years, revoked Mrs. Winn's allowance and re-established Mrs. Huston's in the third will and reduced the latter to $100 per month in the fourth. Lincoln was not mentioned in the first and second wills, was given $200 per month for life in the third, and this was increased to $300 per month in the fourth. The personal effects were given to Mrs. Winn in the first three wills and to Lincoln in the fourth. The codicil made no change except to revoke the gift of personal effects to Lincoln and to give them to contestants. With the codicil, Mrs. Wood left a letter to Austin giving directions for her burial. Austin was named executor in all the wills and trustee of the annuity estates. Contestants claimed that the testamentary intention evidenced by these wills continued to the time of Mrs. Wood's death, as she was under pressure to leave them the bulk of her estate because, in making her his sole legatee, Mr. Wood had expressed the wish that she leave them her property and her affection for him made the wish mandatory on her as a matter of sentiment. Several witnesses testified that prior to 1928 Mrs. Wood recognized her husband's wish and declared her intention to fulfil it. Two witnesses testified that she declared the *Page 570 
same intention in 1928, one shortly before and one shortly after the date of the disputed instrument.
Against the claim of understanding between Mr. Wood and Mrs. Wood, proponent presented a disinterested witness, who had volunteered her testimony on reading of the trial, that when she worked in the Wood home in 1915 and later, Mr. Wood told his wife of his will and said she was free to do as she pleased with the property, but he wanted her to take care of his mother. The mother's financial condition was not shown, except by way of inference from the fact that Mrs. Wood, while she lived, made the mother an allowance of $100 per month, and paid bills for her. Harry Sauders, since 1920 an employee at the ranch and in charge after Mr. Wood's death, testified that in the summer of 1928 Mrs. Wood told him the wills were not really hers, that she had executed them because they told her it was her husband's wish, and she was going to execute a new will in Detroit, leaving her property to Lincoln. Two other witnesses testified that in 1928 Mrs. Wood declared her intention to execute a new will, leaving Lincoln all or most of her property, and Dr. McGibben testified that in September she told him she had done so.
Upon the fact of an agreement between Mr. and Mrs. Wood that the latter leave her property to contestants, the oral testimony plainly presented an issue for the jury. Of considerable force in denial of such arrangement are the improbability that Mr. Wood would make such a request after a short trial of contestants as part owners with him, fail to mention the wish in his will, or want contestants to have the whole estate to the exclusion of his mother, and the fact that no hint of the arrangement appears in any of Mrs. Wood's voluminous and fulsome letters to contestants. *Page 571 
To demonstrate that the wills did not mirror Mrs. Wood's state of mind in the summer of 1928, proponent introduced the testimony of several witnesses that Mrs. Wood of late had been critical of contestants; that she sometimes alluded to Austin as her boss; chafed under the feeling that she had not been kept informed of the affairs of W. E. Wood Company; complained that she did not have the stock interest she ought to have; indicated some feeling because Richardson had an expensive summer home, lavishly furnished, and in which he was not using rugs she had given them; did not like it because Austin appeared at the ranch in an expensive car driven by a colored chauffeur, and contrasted his visit with those of former years when he came in a cheap and worn automobile; mentioned that contestants had wealth and social position superior to her while once they had been subordinate to her and her husband; and even manifested a want of trust in Austin. These declarations, if made, were not in harmony with Mrs. Wood's attitude toward contestants, especially as evidenced by her letters to them. Mrs. Wood was a prolific letter writer, but with such a pronounced habit of complimenting or expressing gratitude or affection to her addressee that a jury could reasonably question whether such state of feeling would be continuously sincere over as long a period as the correspondence lasted, and whether she would not have outbursts of contrary feeling. Her characteristic in this respect may be illustrated by a letter she wrote to Austin in the spring of 1928, that he was right in "not letting me buy" a home in Detroit, although she had thought about it a long while and had set her heart upon it. She was dependent upon Austin for financial guidance. She had no one else to go to. But that suspicion should enter her mind about the Wood company stock or she have *Page 572 
a feeling that contestants had progressed beyond her or that they were deliberately keeping information from her about the corporation business or that she should sometimes voice criticism is so natural that much of this testimony was very probable. Whether she made the claimed oral declarations and whether her actual feelings were expressed in them or in the letters and her conduct toward contestants were questions upon which a sight of the witnesses would be of importance. The jury was in the better position to determine these matters.
The sickness which came on Mrs. Wood in August, 1928, was serious and she knew it. Her relations with her brother had grown closer of late years. When death appears in the offing, the ties of blood grip tighter. The disposition made in the disputed document was not unnatural. Nor was it improbable, if she had the feeling, which the jury could reasonably find, that contestants had been well provided for financially, and if her feeling toward them was as expressed by proponents' witnesses.
The evidence on testamentary intention was sufficient to support a finding in proponents' favor thereon.
Such issues as an alibi for Mrs. Wood as of the time of the claimed execution of the will, the relationship of witnesses to parties, their bias, interest, inconsistent statements, credibility, and the other usual incidents of a heated trial need no discussion, as they were for the jury to decide. Undoubtedly the evidence most damaging to proponent was his own conduct after Mrs. Wood's death. It seems quite repugnant to the claim that he had a genuine will in his possession. That Lincoln was suspicious of Austin was not unnatural. Few nonrelatives, and perhaps few relatives, are likely to do the services Austin performed for Mrs. Wood without compensation, *Page 573 
either open or secret. The means Lincoln claimed he took to discover the property were extraordinary, but his explanation has a basis in human nature and his conduct, however silly or suspicious, could be excused if he impressed the jury as being as slow and simple in mind as his printed testimony suggests. That he claimed to have a will when he visited Austin's office was supported by the testimony of Mrs. Huston, whom the record indicates was rather uncompromisingly honest in her evidence. After all, the issue was whether the will was executed by Mrs. Wood. Lincoln's conduct was indicative rather than determinative.
It was established by the testimony on both sides that in the summer of 1928 Mrs. Wood was thinking of the final disposition of her property. From the conflicting testimony the jury could fairly find that she had the intention to make a will and leave the bulk of her property to her brother. When she went to Detroit, although she was moving to California with only a hope of returning once a year, she did not let contestants know she was in the city nor bid them good-bye. She wrote Austin from the hotel that she did not do so because she was too tired to talk. The incident was so strange that an inference suggests itself that she was on her own business not pleasant to him and did not want interruption. The execution of the will is supported by the sworn statements of the subscribing witnesses. What manner of women they are and whether they would be parties to a criminal conspiracy, the jury, having seen them, could judge the better. And in addition, there was further evidence of particular weight to be found in the paper and the signature of the will.
The paper on which the will was written bore the watermark "Alpine Flax." It was from a cheap tablet and was similar to paper customarily used by *Page 574 
Mrs. Wood. Miss Hall testified that Mrs. Wood brought two or three tablets from Michigan, that she, Miss Hall, wrote bulletins on them without noticing them particularly, that after Mrs. Wood's death she took home the remainder of a tablet which she thought Mrs. Wood had brought with her from Michigan, and the next spring, on counsel's request, made a search and found the pasteboard back and one sheet of the watermarked paper in her apartment. No letters bearing the watermark were written in Michigan before Mrs. Wood left. None was written in California until September 29th, when Miss Hall wrote Austin and Mrs. Wood, Sr., on such paper. Contestants argued that, as Lincoln took away Mrs. Wood's belongings, the tablet had been purchased in California and was brought east by him. That theory is negatived by the fact that October 9th, after Lincoln had gone, Miss Hall wrote Mrs. Austin on similar paper bearing the water-mark. The fact that such paper was once in Mrs. Wood's possession is important. The inference is that the tablet remained in California after Lincoln departed and it does not appear how he later could have procured the paper to forge the will. It is not probable that he would have sent back to California for it, nor that he had time to do so after the other will was read.
Both parties presented opinion evidence regarding the genuineness of the signature. Enlarged photographs of genuine and disputed signatures were introduced. Proponent's witnesses were local bankers and merchants of high standing. Contestants' handwriting experts thought the disputed signature was a tracing, and, while a good casual imitation, was clumsy. Their principal criticism was that it was too carefully written and did not display the free hand and natural handwriting of testatrix. They *Page 575 
analyzed the signature in detail, and it is interesting to note that most of their criticisms would apply with equal force to the signature to the codicil, undisputably genuine, which was written with more care than would be used in ordinary affairs. After prolonged consideration of the testimony and the photographs, we think proponent had the better of this branch of the case and that the jury could fairly find the signature genuine.
Upon the whole case, we cannot say that the jury departed from a fair consideration of the testimony or that the verdict was against the overwhelming weight of the evidence.
Contestants moved for a new trial on the ground of the newly-discovered evidence that Mrs. Paul, in September, 1929, had witnessed another will, which their handwriting expert claims was forged, in which Mrs. Paul's husband's brother was principal beneficiary, and to which he waived his rights when the will was challenged for forgery. The will was finally admitted to probate on Mrs. Paul's testimony of its genuineness. It is not claimed she ever admitted it was forged. She emphatically denies it was forged. The will could have no part in the present suit except by way of prejudicial and improper impeachment.
Contestants also complain of the charge and the failure to give instructions requested. The issue was very narrow, fully covered by the charge, and the jury could neither have been misled as to its duty by the charge given nor aided in it by the instructions requested.
Judgment is affirmed, with costs.
WIEST, C.J., and BUTZEL, CLARK, McDONALD, POTTER, SHARPE, and NORTH, JJ., concurred. *Page 576